Today is 2015-1548 Bamberg v. Dalvey, please. Mr. Holmes, please proceed. Good morning, Your Honors. My name is Steve Holmes, representing the appellant Bamberg. May it please the Court, what we have before you today is a claim construction issue that arises out of an interference proceeding. My primary goal in this argument is to convince you that the claim construction process that the Board took was incorrect. So at the outset, we agree that the adjunct SPINA precedent is the correct precedent to follow. Copy claims in an interference or be interpreted in light of the specification that they were copied from. And we also agree that, according to SPINA, that the Board interprets those claims according to the broadest reasonable interpretation standard. But unfortunately, that's where our agreement with the Board's decision ended. I'd like to focus on the word reasonable in the broadest reasonable interpretation standard. The appellee in oral argument at the Board argued that when doing the broadest reasonable interpretation standard, you look to the specification and that anything relating to a term within that specification could be imported into the claim. And that's where we disagree. A broadest reasonable interpretation rule doesn't give the PTO permission to import anything that's related to the claimed invention. What it does do is it must still be reasonable under general claim construction principles. So I'm going to go right to my question. How does a broad reasonable interpretation of a copied claim become narrower to include a function limitation of melting and mixing and then a temperature limitation when there was no term or phrase in the copied claims that required those limitations? And my answer is that it's because counsel in his argument pushed the Board to harmonize the two specifications, both the Bambi specification and the Dalby specification, by comparing them. And then once you start comparing specifications in a case like this, the whole exercise kind of unravels and becomes a self-fulfilling prophecy that you're going to find issues or discrepancies between the two specifications that may not match up correctly. So properly under Agilent, what the Board should have done was divided those into two discrete analysis. First, a legal analysis, a claim construction, and then under the broadest reasonable interpretation standard. And then once they were construed, a factual determination looking to Bamberg afterwards to see whether Bamberg supported that construction. The problem I see here was that the Board merged those two analysis into one analysis by first looking at both of the specifications. Are you saying that we can't look at the Dalby specification in determining what the scope of the claims are that you copied from Dalby? No, that's exactly what we need to do. So if Bamberg copied Dalby's claims for the interference. So if Dalby's specification makes clear that its invention requires melting and mixing and doesn't claim anything else, then why isn't that a proper limitation to the claim terms, even under the broadest reasonable interpretation standard? Because I would submit to you that that actually narrows the claim because it inserts a functional limitation into a layer. But that's what they invented. That's what they invented. I know there may be a dispute, but that's what they invented. Their claim, their specification, even though their claim language may be broader, their specification makes clear. And under normal claim construction rules, we can look at that. It makes clear that the only thing they invented is the thing that requires melting and mixing. Why isn't that the broadest reasonable interpretation? Because the broadest reasonable interpretation should start with the claims themselves. Well, that's why I ask you, though, are we allowed to look at the specification or not? Yes. Well, if we're allowed to look at the specification and we determine that the specification limits the claims under traditional claim construction principles, then the fact that you could read the claims more broadly in a vacuum doesn't alter the fact that the limited construction is the broadest reasonable construction. Well, I would say that when you're looking at a broadest reasonable construction, it somewhat depends on the claim terms that you're looking at and also if you're looking at it as the invention. Let me ask this outside the context of interference. If we're just looking at claim construction and we have very, very broad claims, I know you think the Dalby claims are very broad, very broad claims, but the specification makes clear that they're not that broad, that they've been their own lexicographer, that they define them in more limited terms. Under that scenario, we have to use that specification to inform the claim construction, don't we? You do, but it doesn't necessarily mean that you have to import those limitations into the claim because otherwise you're – If they were their own lexicographer – I don't understand why you're fighting to choose this example. I mean, it seems unassailable. If they were their own lexicographer and expressly defined the term, you do have to import those limitations into the claim because they defined the term different from its plain and ordinary meaning. That's not your case, so I don't know why you're fighting him on such an unassailably correct principle of claim construction. Okay. What I would say, if we want to use the lexicographer example, Dalby did define what her white layer was. So I guess I'm looking at it in terms of what's being defined. Are we defining the invention or are we defining the white layer? Because every case I've read, going back to the principle, says broadest reasonable construction consistent with the specification or sometimes it says in light of the specification. Isn't that correct? Isn't that the standard? It's not broadest reasonable construction in a vacuum, right? It's broadest reasonable construction consistent with the specification. Consistent with the specification. Right. Okay. I do want to point out that in the lexicographer, Dalby did define what that was. Now, I understand that there is description in the specification that says that the layers melt and mix. She doesn't use language in the specification that clearly disclaims that. She used it in her argument here that said it has to melt and mix. If you looked at the specification with somebody reasonably skilled in the art, interpret that. That remains a question. Is your argument it doesn't rise to the level of disclaimer because that's a very high level of proof that's necessary? Is that your argument? If you looked just at the specification, I don't think it rises to a disclaimer. I think it describes an embodiment. I just want to quote from one section in the Dalby spec where she did define what it was. As used herein, the term white layer refers to a layer on the transfer sheet. The white layer imparts a white background on a dark substrate. I think that's where we need to stay with the claim construction is that the white layer interpreted from a broadest standpoint just means that it's a white layer. You don't need to interpret in how that layer is formed, how it functions once it's applied to the T-shirt. So I think we've gone too far in looking at what the invention really was. If the invention is first defined in the claims, it's a white layer. I don't think we need to go much beyond white. If your claims were properly construed as being a white layer that's both fusible and non-fusible below 220 degrees, don't you still have a written description problem? I don't think so. Where your specification specifically says that your white layer must not be fusible under 220 degrees. I would argue that Bamberg's specification, while it describes a preferred embodiment that does not melt, there's varying language in the specification where he says the white layer... What about a page A1391, line 17 through 18, which says, Suitable pigments are only those which do not melt at ironing-on temperatures. Yes, so those are the pigments that were used within the white layer, and those tend to be dispersed within the polymer that might melt. But it says they only, which do not melt. So your view is that because that's just the pigments within the polymer, it means the white layer can melt? It means that the pigments are inorganic and they really don't have a melting... They do, but it's a very high temperature. I think we can grab some other language in there as well from that same page. The elastic plastics must not melt at ironing temperatures in order to provide with the adhesive layer an undesired mixture with impaired properties. So to me that says, well, it says it must melt. It must melt so that it doesn't provide an undesired mixture. Now undesired doesn't mean it won't work. It doesn't mean that it's being disclaimed. It just means that it's an undesirable embodiment to me. So I don't think it's a disclaimer within his specification that he describes these specific embodiments that don't melt. Well, just to be clear, it's not an issue of disclaimer. It's an issue of possession, right? Correct. Okay, and that's for substantial evidence. It's a question of fact. Right. So if we look at the issue of possession, whether he possessed the concept of a melting layer, I'd say that he did possess that. And I think the Board, from a factual standpoint, may have overlooked some of the evidence that was of record. So if you look at the specific elements that we quoted, those specific sections that talk about an undesired mixture, if he said it was undesired, he obviously had an embodiment that did melt and mix, and he didn't like the way that it looked. So he went on and said, I don't want this layer. This layer probably shouldn't mix. I'm going to develop something a little further. But it doesn't mean that he didn't possess the idea and he didn't possess that whole range. In fact, I'm going to quote from his testimony. Do you have to possess the embodiment or do you have to possess an operable version of the embodiment? And I guess what I mean by that is if you possess it but don't appreciate how it may work and work properly and work well, then I'm not sure you fully possess it. That's my question. The possession of an embodiment, if it was an undesired mixture, he had an understanding that it did work. I would submit that in terms of technically... That it did work. I mean, I don't know. I mean, if somebody's undesirable, that doesn't make them acceptable, right? You go out on a blind date. She was undesirable. Does that really mean you want to go on a second date with her? I don't think so. I'm pretty sure... But to me, that speaks to an understanding of what it is that you're defining as undesirable. Let me quote from his... The Tronzo case, which is analogous to this situation where something was described in the patent as being undesirable, certain shapes were undesirable, and then the preferred embodiment was described as having a different shape, and so there wasn't written description support for those other shapes that were described as being undesirable. Why doesn't that apply here? Correct, because the difference is that Bamberg provided an explanation as to the whole range of temperatures and selected the higher temperatures as what he preferred. In the Tronzo case, I believe they specifically listed some shapes, but then didn't discuss the other ones, or said... Not that they didn't discuss them, they just completely disclaimed them, but didn't say that there was any kind of intermediate that they don't work. Well, they didn't say that they didn't work. They said they were not desirable and that the preferred embodiment used a different shape. Okay. We're into your rebuttal time, so why don't you answer Judge Stoll's question and then maybe we'll save the rest. Okay, and then I'd like to just quote one thing from Bamberg's specification. In the Tronzo case, I think the difference with this case is that Bamberg had an understanding and discussed the differences within his specification that would lead somebody of reasonable skill in the art to say, you could have a layer that melted, but it may not be as good. And I'm going to quote from Bamberg's deposition. We came to an understanding that the clarity and resolution are decreased where the white background layer is permitted to melt and mix. Accordingly, we developed a white layer that did not melt to conventional ironing temperatures. To me, that says that he tested the whole spectrum of it and he understood how it functioned. Is there something else in the specification you would want to point to or just the page 813.91? I understand that's his deposition, but what about the specification? In the rebuttal, I will find those sites for you, and if I could quote them in my rebuttal, that would be great. We'll restore two minutes of rebuttal time, Mr. Holmes. Well, you've got to tell me how to say your name. A lot of consonants. Padmanabhan. Again? Padmanabhan. Padmanabhan. Okay, please proceed. Mr. Padmanabhan. Got it. So certainly if the specification had just disclosed three embodiments but said one was strongly preferred, you wouldn't be here arguing that the other two that weren't described as strongly preferred weren't disclosed, right? I'm sorry. If a specification disclosed three embodiments, and we're trying to decide if the inventor satisfied written description, and if the specification said one of those three embodiments was strongly preferred, it says nothing about the level of preference for the other two embodiments. Yes, Your Honor. You would not be here arguing to me that the inventor didn't possess the other two if they were both completely disclosed, just because he preferred and indicated a preference for one of the three, right? That is correct, Your Honor. So in this case, because he said one is undesirable, he didn't just express a preference for one over the others, but actually said one embodiment is undesirable. How does that make it different? Your Honor, it's a little stronger than that. So in this case, if you look at Mr. Bamberg's specification, it's not just once. He repeatedly tells you in every embodiment that you look at that the one thing that his white layer cannot do is melt or be fusible under 220-degree Celsius. Show me the best site in the patent for supporting that, what you just said. If you start at page 1390, A1390, and if you go towards the bottom, there's a sentence that reads, there's about five sentences up that reads, the white background layer, which is found directly on the adhesive layer, according to the present invention, comprises or is composed of a permanently elastic plastics, which are non-fusible at ironing temperatures, in parentheses, i.e., up to 220 degrees C. And then he goes on to what Mr. Holmes and you discussed about the fillers and the pigments. That's one area where they specifically talk about the white background layer. If you again... Sorry, I don't mean to interrupt this, but I'm a little confused about, if they're claiming this isn't the invention, it has to be this stuff, but they know about another way to do it that doesn't work in their view, is that an embodiment of the invention, or is it just not the invention and not in the specification? It's not the invention. It's not the specification. It's exactly what Judge Stoll said about the Tronzo case, because I was going to say the same thing, which is, at that point, it's them, the inventor, telling you and giving reasonable notice to people's skill in the art that that is not what I'm covering in my spec. In fact, Mr. Bamberg in there... in some theoretical sense. In some theoretical sense, because the rule on written description is, you're looking at the four corners of the patent to determine what it's conveying to one of skill in the art, or reasonably conveying to one of skill in the art. And in this case, when you read the Bamberg specification, what it conveys to a person of ordinary skill in the art is the one thing Mr. Bamberg does not possess is an iron-on where the white layer is fusible below 220 degrees C. And so whether Mr. Bamberg knew about it, whether he didn't know about it, I'm not sure, but whatever he did know, what he conveyed in his patent application, was that that's certainly not his invention. If you want a couple others, I don't know if you want more sites than the 1390, but you can also look... an easy place to look is 1400 and then also the claims in 1404. What's your response about the pigments? I had asked about the sentence on 1391 saying, suitable pigments are only those which do not melt at ironing-on temperatures, and was told that, well, that's just the pigments, not the layer. How do you respond to that? Your Honor, I think that's too fine a distinction made by Bamberg. The layer itself contains both what he's calling the elastic plastic and the pigment. And so that layer will have both in it. And then so that's why they say it's filled with the pigment. And so it's that layer that's not melting. And what Bamberg is making clear is, neither the plastic nor the pigment melts at temperatures below 220 degrees. Are you also relying on the statement at the top of A1391 that says the elastic plastics must not melt at ironing temperatures in order to not... Yes. I'm sorry. Yes, I am. And you can see it again in the next paragraph down where they're talking... two paragraphs down where they're talking about the suitable pigments. If you go to the second sentence there, they say the filled white layer where the polymers contained therein, which is the elastic plastic respectively, e.g. the polyurethane, must not melt and even explains why. But again, and there it's not even at ironing temperatures. He's just saying it must not melt. Mr. Bamberg, throughout his specification, very consistently makes clear that he did not possess that embodiment. Now, there's a fundamental... Bamberg's premise for their argument is fundamentally wrong. If you look at the board's order, you see that they very faithfully followed the Agilent case. And what they did, and you can even look at the board's statements, the board specifically agrees with Bamberg in saying they do not include and should not... and the claim should not be construed to include a melting temperature limitation. And they say again in page 11 of the board's order, they say the two Bamberg applications do not contain any claim language that includes or should be construed to include a melt temperature range. And then they go on to tell you what the scope of the claims are, very consistent with Agilent. And they point out exactly what Dalby discloses. That's what Agilent asked you to do. And what they say is Dalby discloses embodiments where that white layer can be fusible or non-fusible at temperatures up to 220 degrees. And that's the exact same analysis that the McMullen case did in following Agilent. They then separately then see does Bamberg, who copied the claims, did they have possession of that invention, is exactly the next step that's followed by the case law, both in McMullen and it's the analysis that Agilent asked the court... asked the board to do. And that's exactly what happened here for the board to reach its conclusion. The board did not read any functional limitations. All the board did simply was to construe the claims as written and look at the spec exactly as they did in McMullen, which is on all fours with this case. And if you look at the McMullen case, you'll see that in that case, the McMullen copied the claims from Carroll. They then looked at the claim language there. The claim language there is outward angle or outward angulation. And what they did was they looked at the claim language and they said, okay, let's see what Carroll discloses about that. And he had a wide range of angles for that. Then they look at the McMullen spec and say, what did you disclose for that there? And they find out that McMullen limited it to no more than 15 degrees. And it's the same here. They look at the white layer and then they look at the white layer language and they say, okay, it's any white layer because I've told you it can be fusible or not fusible. And then they go back and they say, what did Dalvey disclose and did Bamberg disclose the same scope? And in that same way, they decide, just as in McMullen, that there was not written description support for Bamberg. Do all of the claims at issue, I guess that's all the copied claims, require a white layer? I'm sorry, Your Honor, and I should clarify that. So the parties in this case, when we were briefing in front of the board, used the term white layer as a shorthand for all claim limitations that refer to a portion or a layer that has a white or luminescent pigment. And so all the claims, every claim has some version of that claim language that we're calling a white layer. So the answer is yes, that every claim has a white layer, but it's not the specific term white layer. It's any language that, fairly read, would relate to a layer or a portion of the iron-on that goes to being a white or luminescent pigment. The last point I'd make on claim construction is if you look at the board's order and their final conclusion that Dalvey actually has an invention where it can use any suitable white layer, it's contrary to Bamberg's argument now that the board somehow limited the claims because that would be contrary to their finding that any suitable white layer could be used in the Dalvey invention. Lastly, I'll just mention briefly, the board also did a thorough job in analyzing the Bamberg spec to determine if there was written description. They found there was substantial evidence. The board was very careful to look at this Bamberg specification, their records at the USPTO, expert testimony as well as Mr. Bamberg's own testimony, and there's substantial evidence to support it. We went through some of the sites in the Bamberg specification. You can also look at the statements made by the USPTO independently where the USPTO, Mr. Bamberg tried to get a claim allowed where he asked for a white layer with a softening point below 220 degrees, and the USPTO independently said you can't get that claim because you don't have written description support for it, which is consistent with the board's finding, and the board acknowledged that. Mr. Bamberg himself in his testimony confirmed that the invention that he had is not a white layer that melts below 220 degrees. If there's no other questions, I have nothing else. Thank you. Mr. Holmes, we'll give you two minutes of rebuttal time. Please proceed. Yes. Thank you, Your Honor. Four quick points, if I can fit them into my two minutes. Judge Stoll had asked about some references in the Bamberg specification where we can point to that. Also on 1391, we see a paragraph, 15 lines down, starting with preferred elastic plastics for the white background layer selected from the group comprising polyurethanes, polyacrylates, et cetera. In that, he does not limit those to plastics that don't melt. Polyurethanes melt over a wide range of temperatures. I'm going to move on quickly to counsel's discussion of McMullen. McMullen we distinguished in the briefs. I'm just going to cover it very quickly. It was reasonable for the court to interpret the angle in McMullen because the word angle was in the claim. So when you interpret the construction has to start with the claims. There has to be something that you're looking to clarify when you look to the specification. So in the claim that was copied in McMullen, the word angle was there. So we thought it was fair for the board to look to the Carroll specification to see what that claimed range was. And then if you look to the McMullen specification, they didn't claim the same range. So I think that's distinguishable here because in the copy claims that we have in this application, there is no term for the board to go look to the specification to define a function of how the white layer melts. If you look to what that term is supposed to mean, it's enough pigment, white means enough pigment to provide an opaque background. Or as her own lexicographer, that it provides a white background.  I think that is my time. Thank you, Mr. Holmes. The case is taken under submission. I thank both counsel.